

**FILED**

May 04 2016, 6:11 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael B. Troemel
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Christina D. Pace
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Reginald Lee Robinson, <br> *Appellant-Defendant*, <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff*. | May 4, 2016 <br><br> Court of Appeals Case No. <br> 12A02-1507-CR-784 <br><br> Appeal from the Clinton Circuit Court <br><br> The Honorable Bradley K. Mohler, Judge <br><br> Trial Court Cause No. <br> 12C01-1311-FA-1067 |

**Brown, Judge.**

[1] Reginald Lee Robinson appeals his convictions for two counts of attempted murder. Robinson raises one issue which we revise and restate as whether there is sufficient evidence to support the jury's rejection of his insanity defense. We affirm.

## Facts and Procedural History

[2] On November 8, 2013, Robinson spent several hours writing at a desk in the lower level of the Frankfort Library, which was his custom. At some point, Gladys Brewer and her four-year-old great granddaughter M.L. exited the library, and Robinson exited the library as well. Robinson attacked M.L., stabbing her repeatedly in the face and hand with a screwdriver that was sharpened to a point. Brewer, who had never seen Robinson before, ran over to M.L., and Robinson struck Brewer in the face, stabbing her "in the head and dragging" the screwdriver. Transcript at 335. Robinson's screwdriver became caught in Brewer's book bag, and Brewer was able to pick up M.L. and carry her to a bench.

[3] Andrea Slipher, the gardener for the library, saw that Robinson was walking in circles and was "just crying - kind of wailing." *Id.* at 348. She heard him state "[t]hey wouldn't leave me alone" over and over. *Id.* Slipher walked toward him and observed him lean against the side of the building and slide down until he was sitting. Robinson looked up at Slipher, said "[c]all the police and the ambulance," and then dropped the screwdriver between his legs, and Slipher reached down and picked it up. *Id.* at 349.

[4] Frankfort Police Sergeant Thomas Dillingham responded to a dispatch reporting that there were two females bleeding at the front of the library. Sergeant Dillingham approached Robinson, who was sitting on the sidewalk leaning against the building, and Robinson immediately told him that "they wouldn't leave him alone and he couldn't take it anymore and so he snapped" and then continued to mutter as Sergeant Dillingham was standing there that "I went berserk and I snapped." *Id.* at 373. M.L. was sent by helicopter to Riley Children's Hospital in Indianapolis, has undergone multiple surgeries, and may need additional surgeries. M.L. sustained numerous puncture wounds to her face, other wounds to her hand, and trauma to her left eye resulting in the loss of her sight in that eye. Brewer sustained puncture wounds on the left side of her head.

[5] The State charged Robinson with two counts of attempted murder, aggravated battery as a class B felony, two counts of criminal confinement as class B felonies, battery resulting in serious bodily injury to a person less than fourteen years of age as a class B felony, and two counts of battery by means of a deadly weapon as class C felonies. Robinson filed a notice that he intended to assert the defense of mental disease or defect, and the court appointed Dr. Vernon Little, M.D., and Dr. Jeffrey Wendt, Ph.D., to evaluate him.

[6] At Robinson's trial, the jury heard testimony from, among others, Dr. Little, Dr. Wendt, Slipher, Sergeant Dillingham, Robinson's brother Geoff, and Sharon Hayden, who had given Robinson a ride to the library the day of the attacks. Slipher testified that the words "[t]hey wouldn't leave me alone" were

the first words she heard Robinson say, although not to her in particular, and that the words "[c]all the police and the ambulance" were the first words that Robinson said directly to her. *Id.* at 365. Sergeant Dillingham testified that, upon his arrival at the library, Robinson immediately informed him that he had snapped. Robinson's brother Geoff testified that Robinson had "snapped a few times in his temper" but that it was verbal and he did not observe violence by Robinson. *Id.* at 667.

[7] Dr. Little testified regarding his educational and professional background and his experience working with the mentally ill. He testified that he had personally met with and evaluated Robinson and he concluded that Robinson suffered from a mental disease and substantial defect but that he could appreciate the wrongfulness of his actions. On cross-examination, Dr. Little indicated that Robinson had been transported to his office for the interview, that at some point there was a fire alarm that caused everyone to evacuate the building, and that he did not continue the interview after the evacuation.[1] Dr. Little further indicated he was familiar with the details of the stabbing, and, when asked what information he drew upon to familiarize himself with those details, he stated that most of it came from other records that were made available to him. He stated that his belief from the records was that Robinson was not acquainted

---

[1] Dr. Little stated he had met with Robinson for approximately one and one-half hours, Robinson's counsel stated that Robinson disputes that time, Dr. Little indicated he was not sure about the time and that the time he gave was approximate, and, when asked if he recalled being interrupted after less than an hour because of a fire alarm, Dr. Little replied that there was a fire alarm. Dr. Little later testified: "I think it was more than the uh hour. But it could have been certainly less than that." Transcript at 881.

with the victims, that he was aware the crime took place in public during the day, that he was aware Robinson had been in the library prior to the offense, and that he did not remember the name of a bystander. When asked if he was aware of what Robinson said to the bystander, Dr. Little responded that he recalled that Robinson said to call the police. Dr. Little indicated that he did not have any notes from his meeting with Robinson and, when asked if he prepared his report three months after he had met with him, replied that was approximately when he filed his report. Dr. Little agreed that he had said in his report that Robinson is chronically mentally ill, testified that he believed that the diagnosis of schizophrenia was the most likely diagnosis, and acknowledged that he had written in his report that Robinson's actions of attacking the victims certainly related to his mental illness.

[8] On questioning by the deputy prosecutor, Dr. Little stated that his report indicated that Robinson's persecutory delusions involved a preoccupation and sensitivity to what he perceived to be loud and disruptive noises. He testified that Robinson did not give him many specifics about the attacks, that he did indicate that he could not control himself at that point, and that he did not go into details about what he was thinking. Dr. Little testified that Robinson indicated he was startled by a loud noise which caused his loss of control, that Robinson would have been able to understand that what he was doing was wrongful, that being startled by its nature is a transient event, and that after the initial startle Robinson would, based on his records, be able to refrain from doing anything. Dr. Little agreed that repeatedly stabbing was a more

protracted response rather than a simple startled reflex, and that sixty to seventy percent of his case load involves people with schizophrenia. When asked the significance in his opinion of the fact Robinson said to call the police, Dr. Little testified that the statement suggests some awareness that he was doing something criminal.

[9] Dr. Wendt testified regarding his educational and professional background, that he had personally met with and evaluated Robinson, and that he concluded that Robinson suffered from a severe mental illness that interfered with his perception of reality during the time in question and his appreciation of the wrongfulness. He testified regarding his methodology and that he was provided with materials related to the case, including police reports, and Robinson's prior treatment records. He testified that Robinson believed there was a conspiracy against him, that he had described how he had noticed M.L. and her grandmother leave the library immediately before him, that he crossed paths with M.L., who was making noises, that he perceived this to be part of the conspiracy and was overwhelmed by his paranoid delusions, and that he spontaneously attacked her. Dr. Wendt testified that, based on his interview, Robinson's statement "they won't leave me alone" was not referring to the victims in this case but to the people who he believed had been after him for years. *Id.* at 920. He testified that, when he asked Robinson why he did not run after the attacks, Robinson said that he did not see any point in it, that everybody knew him and knew what was happening, and that he "was hoping this would force them to show their hand." *Id.* at 921.

[10] Additionally, Sharon Hayden testified that she worked at a clinic which was about a block from the library, that she regularly gave Robinson a ride from his home to the clinic and he would often spend a portion of his day at the library, and that she had given him a ride the day of the attacks. She testified that Robinson was very intelligent and he was lucid and oriented. She stated that, at some time, she and her husband offered to give him a television, that he replied that he did not think he was "in the right frame of mind . . . for a TV," and that, in 2010 or 2011 when talking to him about applying for assistance, she understood him to say that he was hearing voices, that she believed he made that statement because it could help him obtain the assistance, and that Robinson never made any other similar statements to her. Transcript at 586. Hayden testified that, when she gave Robinson a ride, they would talk about things that happened in town and things he had read at the library, and that nothing about their conversations suggested that Robinson was mentally ill or dangerous in any way. She stated she never observed Robinson in a situation she thought was dangerous to himself or others, that he has a good moral compass, and that he knows right from wrong. She also testified that, on the morning of the attacks, she gave him a ride, that he said that some guys in a black Camaro had harassed him when he had been out in his yard the previous day, but that everything seemed fine and he was joking and laughing.

[11] The jury found Robinson guilty but mentally ill on all counts as charged. The court sentenced him to thirty-five years for the attempted murder of M.L. and

thirty years for the attempted murder of Brewer, ordered that the sentences be served consecutively, and vacated the other counts.

## *Discussion*

[12] The issue is whether there is sufficient evidence to support the jury's rejection of Robinson's insanity defense. When reviewing a jury's verdict which rejected the defense of insanity, we will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact. *Myers v. State*, 27 N.E.3d 1069, 1074 (Ind. 2015) (citing *Galloway v. State*, 938 N.E.2d 699, 709 (Ind. 2010) (citing *Thompson v. State*, 804 N.E.2d 1146, 1149-1150 (Ind. 2004)), *reh'g denied*), *reh'g denied*. "[A] finding that a defendant was not insane at the time of the offense warrants substantial deference from reviewing courts." *Id.* (citing *Galloway*, 938 N.E.2d at 709 (citing *Barany v. State*, 658 N.E.2d 60, 63 (Ind. 1995))). Thus, when a defendant claims that an insanity defense should have been successful, the conviction will be set aside only "when the evidence is *without conflict* and leads only to the conclusion that the defendant was insane when the crime was committed." *Id.* (quoting *Galloway,* 938 N.E.2d at 710 (quoting *Thompson,* 804 N.E.2d at 1149)).

[13] Robinson contends that the verdicts of guilty but mentally ill are contrary to law and the jury should have found him not responsible by reason of insanity. He argues that the basis of Dr. Little's opinion was almost non-existent, that Dr. Little saw him for less than an hour, that he took no notes and prepared his report three months after the meeting, and that he relied upon other records available to him. Robinson argues that Dr. Little believed that the first thing he

said after the stabbing was "call the police" when in fact the testimony shows that he said "call the police" well after he was walking around in circles stating "they won't leave me alone." Appellant's Brief at 14. Robinson asserts Dr. Little's opinion does not qualify as credible and contends his convictions must be reversed.

[14] The State maintains that the evidence was sufficient to support the jury's decision and that Dr. Little based his opinion that Robinson was able to appreciate the wrongfulness of his conduct at the time of the offense on the fact Robinson was able to control himself after an initial startle and the stabbing was a protracted response, and that his first words directed to another person were "call the police." Appellee's Brief at 11. The State argues that Robinson's challenges to Dr. Little's testimony were placed before the jury and the jury still credited his testimony. The State also contends that other lay testimony supports the conclusion that Robinson was sane at the time of his offense, and that Robinson's argument is an inappropriate invitation "to re-assess the 'battle of the experts' that played out before the jury." *Id.* at 13.

[15] To be convicted of a criminal offense, the State must prove each element of the offense beyond a reasonable doubt. *Myers*, 27 N.E.3d at 1074-1075 (citing Ind. Code § 35-41-4-1(a)). Criminal responsibility can be avoided if the defendant can successfully raise and establish the "insanity defense." *Id.* at 1075 (citing *Galloway*, 938 N.E.2d at 708; Ind. Code § 35-41-3-6(a)). To successfully assert this defense, an individual must prove by a preponderance of the evidence: "(1) that he or she suffers from a mental illness and (2) that the mental illness

rendered him or her unable to appreciate the wrongfulness of his or her conduct at the time of the offense." *Id.* (citing *Galloway*, 938 N.E.2d at 708). Thus, proof of mental illness alone is insufficient. *Id.* (citations omitted).

[16] Robinson asserted an insanity defense, and the jury found him guilty but mentally ill. The parties do not dispute that Robinson suffered from a mental illness, and the question for purposes of his insanity defense is whether his mental illness prevented him from understanding the wrongfulness of his conduct at the time of the offense. *See id.* (noting it was not disputed that Myers suffered from a mental illness and that therefore the only remaining question for the purposes of his insanity defense was whether his mental illness prevented him from understanding the wrongfulness of his conduct at the time of the offense). "It is for the trier of fact to determine whether the defendant appreciated the wrongfulness of his conduct at the time of the offense." *Id.* (citing *Thompson*, 804 N.E.2d at 1149). The defendant is in the position of having to appeal a negative judgment. *Id.* A reviewing court will reverse only when the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed. *Id.* The reviewing court will not reweigh the evidence or assess the credibility of witnesses but will consider only the evidence most favorable to the judgment and the reasonable and logical inferences to be drawn therefrom. *Id.*

[17] In addition, the Indiana Supreme Court has noted that Indiana precedent has clearly established that unanimous expert testimony alone is not determinative where there is conflicting lay opinion testimony or demeanor evidence also

presented at trial. *See id*. (citing *Cate v. State*, 644 N.E.2d 546, 547 (Ind. 1994)
(explaining that this Court has "never held expert testimony to be conclusive")).
The Court observed that, in previous cases where insanity defenses were
unsuccessful even in light of non-conflicting expert testimony that the
defendants were insane at the time of the offense, it had upheld the convictions
"because the evidence as to the defendant's insanity was in conflict and thus
sufficient to sustain the trier of fact's determination of sanity." *Id.* at 1075-1076
(citing *Galloway*, 938 N.E.2d at 710 (citing *Thompson,* 804 N.E.2d at 1150;
*Gambill v. State*, 675 N.E.2d 668, 672 (Ind. 1996), *reh'g denied*; *Barany*, 658
N.E.2d at 64; *Cate,* 644 N.E.2d at 548; *Rogers v. State*, 514 N.E.2d 1259, 1261
(Ind. 1987); *Green v. State*, 469 N.E.2d 1169, 1172 (Ind. 1984))). The Court
noted that, in each instance, "there has been other sufficient probative evidence
from which a conflicting inference of sanity reasonably could be drawn." *Id.* at
1076 (citing *Galloway,* 938 N.E.2d at 710). The Court further noted that, for
example, demeanor evidence, "when considered in light of the other evidence"
can permit a jury to draw a reasonable inference of sanity. *Id.* (citing *Galloway,*
938 N.E.2d at 712 (citing *Thompson*, 804 N.E.2d at 1149)). The Court held this
is true because "testimony regarding behavior before, during, and after a crime
may be more indicative of actual mental health at [the] time of the crime than
mental exams conducted weeks or months later." *Id.* (citing *Thompson*, 804
N.E.2d at 1149 (citing *Barany*, 658 N.E.2d at 64)).

[18]     Dr. Little's testimony is probative evidence that Robinson was not insane when
he committed the attacks, despite its conflict with Dr. Wendt's testimony, and

the jury was free to find Dr. Little's opinion persuasive. *See Lawson v. State*, 966 N.E.2d 1273, 1281 (Ind. Ct. App. 2012) (noting that one expert's testimony was probative evidence that the defendant was sane when she committed the crimes, despite its conflict with the testimony of another expert, and that the jury was free to credit the first expert's opinion over the second expert's opinion), *trans. denied*. The jury, in assessing the weight of Dr. Little's conclusions, was able to consider his testimony regarding the length of his interview of Robinson, the fact he drew upon other records available to him to familiarize himself with the details of the stabbing, and the fact he did not have any notes from his meeting with Robinson. Further, Robinson's counsel thoroughly cross-examined Dr. Little in an attempt to point out the possible shortcomings or weaknesses of his evaluation of Robinson and his conclusion regarding Robinson's sanity at the time of the attacks. We acknowledge that the interviews by Dr. Little and Dr. Wendt occurred well after the stabbings and, as Judge Mathias notes in his concurring opinion, that our criminal justice system would be better served if psychiatric examinations of defendants occurred shortly after arrest and before the administration of medication. This would greatly assist the trier of fact in determining whether a defendant's mental illness rendered him or her unable to appreciate the wrongfulness of his or her conduct at the time of the offense. Even so, the trier of fact may take into account the delay between the time of an offense and an examination of the defendant in assessing the weight of the examiner's testimony or a report prepared by the examiner.

[19] Moreover, as reiterated by the Indiana Supreme Court, even unanimous expert testimony is not determinative where there is conflicting lay opinion testimony or demeanor evidence, and testimony regarding behavior before, during, and after a crime may be more indicative of actual mental health than the subsequent mental exams. *See Myers*, 27 N.E.3d at 1075-1076. Here, the record shows that, in addition to the testimony of Dr. Little and Dr. Wendt, the jury heard significant lay testimony and other evidence regarding Robinson's behavior before, at the time of, and after his attacks on Brewer and M.L., including from the responding officers and from Hayden regarding her previous interactions with him and his behavior the morning of the stabbings. To the extent reasonable minds could interpret a conflict in the evidence regarding Robinson's sanity at the time of the offense, a jury could nevertheless determine, based on the expert and lay testimony presented, that Robinson demonstrated an understanding that stabbing people is wrong, and it is not the role of the court on appeal to reweigh the evidence presented at trial and make a determination as to which of those inferences the jury should have made. *See id.* at 1078.

[20] Based upon the record, we conclude it was possible for the jury to have made a reasonable inference that Robinson, while mentally ill, was able to appreciate the wrongfulness of his conduct at the time of the offense and to reject his insanity defense. *See id.* at 1077-1078 (holding that, based upon the circumstantial evidence provided, it was possible for a reasonable jury to conclude that Myers was able to appreciate the wrongfulness of his conduct at

the time of the offense and that, although there was evidence that could also support the conclusion that Myers was insane at the time of the crime, it need only be demonstrated that inferences may reasonably be drawn which support the finding of guilt and it is not within the purview of the court on appeal to reverse the jury's verdict simply because a "more reasonable" inference could be made, and affirming Myers' convictions on four counts of attempted murder); *Lawson*, 966 N.E.2d at 1278-1283 (noting the jury was free to credit the opinion of one expert over the other and that there was independent lay witness testimony tending to corroborate the expert's opinion that the defendant was sane, and holding there was sufficient evidence to support the jury's rejection of the defendant's insanity defense).

## Conclusion

[21] For the foregoing reasons, we affirm Robinson's convictions for two counts of attempted murder.

[22] Affirmed.

Kirsch, J., concurs.

Mathias, J., concurs with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

Reginald L. Robinson,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

May 4, 2016

Court of Appeals Case No.
12A02-1507-CR-784

**Mathias, Judge, concurring.**

I concur with my colleagues.

However, I write separately to point out yet again the inadequacy of our criminal justice system when confronted with defendants who are mentally ill. Psychiatric examinations of a defendant who likely suffers from serious mental illness should occur shortly after arrest and before any administration of psychotropic medication in jail to more accurately determine whether the

defendant could have possibly had the requisite *scienter* or *mens rea* at the time of the crime. As I have previously stated:

> Our criminal justice system needs an earlier and intervening procedure to determine competency retroactively to the time of the alleged crime. Perhaps we as a society need to consider the concept of a defendant being unchargeable because of mental illness under Indiana Code section 35-41-3-6, and not just guilty but mentally ill under Indiana Code section 35-36-2-1, et seq. In either case, the commitment proceedings provided for in Indiana Code section 35-36-2-4 would both protect society and best care for the defendant involved.

> Whether such a procedure is promulgated by the Indiana Supreme Court through its rule-making process or by the Indiana General Assembly through statute, it is time for the truly long-term, incompetent criminal defendant to have an earlier and intervening opportunity for a determination of his or her competency at the time of the crime alleged. Such a procedure convened soon after arrest, rather than years later when stale evidence and dim or non-existent memories are all that are left, or never, would best serve society and the defendant.

*Habibzadah v. State*, 904 N.E.2d 367, 371 (Ind. Ct. App. 2009) (Mathias, J., concurring).

[25] In this case, the stabbings occurred on November 8, 2013, and Robinson was charged on November 12, 2013. It was more than six months before the trial court issued its order appointing Dr. Wendt and Dr. Little. Dr. Little interviewed Robinson on August 4, 2014, for approximately one hour. Dr. Wendt interviewed Robinson on August 6, 2014, for approximately two-and-

one-half hours. These two interviews took place almost nine <u>months</u> after the acts that led to Robinson's arrest and charges, when a delay of even nine <u>days</u> might well have caused inaccurate assessment.

[26] The doctors agreed that Robinson suffers from chronic mental illness, but only Dr. Little believed that Robinson was able to appreciate the wrongfulness of his conduct. Also, "[o]ur cases have consistently held that conflicting *credible* expert testimony is sufficiently probative of sanity." *See Galloway v. State*, 938 N.E.2d 699, 710 (Ind. 2010) (emphasis added).

[27] I believe that the trial court should have concluded that Dr. Little's testimony lacked credibility, as a matter of law, under its gatekeeping authority regarding expert testimony Ind. Evid. Rule 702; *Halterman v. Adams County Bd. of Com'rs*, 991 N.E.2d 987, 989-90(Ind. Ct. App. 2013) (citing *Burp v. State*, 612 N.E.2d 169, 172 (Ind. Ct. App. 1993)). After his brief interview with Robinson, Dr. Little reviewed his medical records and the police reports but did not review the video of the stabbing. He did not take any notes during his interview with Robinson. Three months later, without any notes of that interview, he prepared and filed his report with the trial court. At trial, Dr. Little also testified that he was not aware that immediately after the stabbing, Robinson was walking around in circles "wailing" and stating over and over ,"[t]hey wouldn't leave me alone." Tr. pp. 348, 880-81. Refusing to admit Dr. Little's opinion because of these serious inadequacies would have left the jury with Dr. Wendt's testimony which found that Robinson was incapable of forming the requisite *scienter* at the time of the criminal act.

[28] Yet, in Indiana, juries are empowered to ignore expert testimony, in favor of the testimony of the lay witnesses. With such a horrendous sequence of events, the jury chose to do so at Robinson's trial. *See Myers v. State*, 27 N.E.3d 1069 (Ind. 2015). When faced with acts such as those committed by Robinson, I can understand the jury's emotion and its desire to protect society by placing a defendant like Robinson behind bars for the rest of his life, rather than considering the logic of a lifetime of treatment in a secure mental health facility. It is a difficult decision for a judge to overturn such a verdict. "Indiana precedent has clearly established that unanimous expert testimony alone is not determinative where there is conflicting lay opinion testimony or demeanor evidence also presented at trial" *See id.* at 1075. I am therefore constrained to concur.