# FOR PUBLICATION



FILED
Apr 25 2012, 8:23 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL R. FISHER**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JOHN LUDACK, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1109-CR-930 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Lisa F. Borges, Judge
Cause No. 49G04-1102-FA-7679

**April 25, 2012**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

## Case Summary

John Ludack was convicted of two counts of class A felony child molesting and adjudicated a habitual offender and sentenced to an aggregate term of one hundred thirty years. On appeal, he argues that his constitutional right against compulsory self-incrimination was violated when the detective who interviewed him testified that Ludack neither admitted nor denied the allegations of child molesting but just asked to stop speaking. Ludack also argues that his sentence is inappropriate in light of the nature of the offenses and his character.

We conclude that defense counsel, by first asking the detective whether Ludack had admitted the allegations of child molestation during the interview, opened the door to the detective's testimony. We also conclude that Ludack fails to carry his burden to persuade us that his sentence is inappropriate. Therefore, we affirm his convictions and sentence.

## Facts and Procedural History

In June 2008, Ludack lived in an Indianapolis apartment with his girlfriend T.E. and her children: ten-year-old M.E. and her older brothers, T.V. and A.V. Ludack had been living with them approximately eighteen months. T.E. worked full-time at a pharmacy and attended cosmetology school. While T.E. was working and attending classes, Ludack cared for the children, with whom he had a good relationship.

One day in early June while T.E. was at work, Ludack told M.E. to go into her mother's bedroom. Once there, Ludack told her to take off her clothes. M.E. tried to leave, but Ludack blocked the door. M.E. said that she was going to call her mother, but Ludack

2

had the phone and would not give it to her. M.E. was scared. Ludack finally let M.E. out of the bedroom, but would not let her call her mother.

Ludack then told M.E. to go to her bedroom. He followed her into her room and shut the door behind him. He told her to remove her pants and underwear and get on the bed. She complied and lay on her back. Ludack forcibly held M.E. down as he put his penis in her vagina. M.E. was frightened and in pain. She tried to make him stop and struggled to get up. He violently held down her legs using a great deal of force. Afterward, M.E. continued to feel pain and noticed that she was bleeding a little bit. Ludack told M.E. that if she told anyone that he "would hurt [her] mom or [Ludack and her mom] would be gone for a long time, or he would hurt anyone [that M.E.] told." Tr. at 30.

During the first two weeks of June, Ludack forced M.E. to have sexual intercourse several times. Once, it occurred in her mother's bedroom. Another time, M.E. fought back and scratched Ludack. Another time, Ludack attempted to force her to have sexual intercourse in the living room, but he was interrupted when T.V. and A.V. knocked on the apartment door and wanted to come in.

On June 15, 2008, Ludack left the apartment and never returned. Sometime after Ludack left, M.E. tearfully explained to T.V., using hand gestures, that Ludack had put his penis in her vagina. She told T.V. not to tell anyone because Ludack had said that he would hurt someone. T.V. did not tell anyone until January 2011, when he broke down and told his father, who immediately called T.E. She in turn immediately called the police. A forensic child interviewer interviewed M.E., and a medical doctor physically examined her. The

3

physical exam did not reveal any physical evidence of the sexual abuse that had occurred two and a half years earlier. Indianapolis police detective Chris Lawrence interviewed Ludack, T.E., T.V., and T.V.'s father.

The State charged Ludack with two counts of class A felony child molesting[1] and two counts of class C felony child molesting and alleged that he was a habitual offender. The jury found Ludack guilty as charged, and he pleaded guilty to the habitual offender enhancement. The trial court sentenced Ludack to fifty years on each class A felony child molesting conviction and thirty years for the habitual offender enhancement, to be served consecutively, for an aggregate executed sentence of one hundred thirty years. Ludack appeals.

## Discussion and Decision

### I. Fifth Amendment Violation

At trial, Detective Lawrence testified for the State. On direct examination, the prosecutor asked Detective Lawrence (1) whether he had interviewed Ludack, (2) whether Ludack stated that he was living with T.E. in June 2008, and (3) whether Ludack stated that he provided childcare to T.E.'s children. Detective Lawrence answered all three questions affirmatively. The prosecutor did not ask any other questions about Detective Lawrence's interview with Ludack. On cross-examination, Ludack's attorney asked Detective Lawrence whether Ludack "made any admissions" during the interview, and the detective replied, "He

---

[1] A person at least twenty-one years of age who, with a child under fourteen years of age, performs or submits to sexual intercourse or deviate sexual conduct commits class A felony child molesting. Ind. Code § 35-42-4-3.

4

didn't admit to it, no." Tr. at 122-23. At a sidebar conference, the prosecutor argued to the court that the jury was left with a false impression and that she wanted to further examine the detective to confirm that Ludack had neither admitted nor denied the allegations of sexual abuse. The trial court granted the request, and the prosecutor questioned Detective Lawrence as follows:

Q: When you did you[r] interview with John Ludack, it was a fairly short interview, wasn't it?

A: Yes, it was.

Q: And during that short period of time he gave you a few facts that we've already discussed, is that correct?

A: Yes, he did.

Q: And he neither admitted nor denied committing the offense, didn't he?

A: He didn't deny doing it either; *he just asked to stop speaking*.

*Id*. at 124-25 (emphasis added). Ludack did not object, move to strike, or move for mistrial.

Ludack argues that Detective Lawrence's testimony violated his right against compulsory self-incrimination guaranteed in the Fifth Amendment to the United States Constitution, resulting in fundamental error. "'In order to constitute fundamental error, an error must be blatant and the potential harm must be so substantial and apparent that to ignore it would clearly constitute a denial of due process.'" *Owens v. State*, 937 N.E.2d 880, 885 (Ind. Ct. App. 2010) (quoting *Hinkle v. State*, 569 N.E.2d 349, 350 (Ind. Ct. App. 1990), *trans. denied* (1991)), *trans. denied* (2011).

5

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."[2] This privilege extends to the states through the Fourteenth Amendment. The scope of the privilege is comprehensive.

> The privilege can be claimed in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory. [I]t protects any disclosures which the witness may reasonably apprehend could be used in a criminal prosecution or which could lead to other evidence that might be so used.

*Application of Gault*, 387 U.S. 1, 47-48 (1967) (citation and quotation marks omitted).

Specifically, Ludack argues that his Fifth Amendment right was violated when, during the State's case-in-chief, Detective Lawrence testified that Ludack "didn't deny doing it either; he just asked to stop speaking." Tr. at 125. In arguing whether this testimony presents a Fifth Amendment violation, the parties disagree on whether the State used Detective Lawrence's testimony as substantive evidence of Ludack's guilt. They also disagree as to whether Detective Lawrence's testimony revealed that Ludack had invoked the right to remain silent or reflected pre-arrest, pre-*Miranda* silence.[3] We need not untangle these disagreements to determine whether fundamental error occurred. Instead, we conclude that because it was defense counsel who first questioned Detective Lawrence as to what

---

[2] "Article I, section 14, of the Indiana Constitution also protects a defendant's right to remain silent at trial." *Boatright v. State*, 759 N.E.2d 1038, 1043 (Ind. 2001). Ludack does not challenge his convictions on state constitutional grounds.

[3] The State characterizes Detective Lawrence's testimony as a comment on Ludack's pre-arrest, pre-*Miranda* silence, and does not analyze the issue in terms of the invocation of the right to remain silent. Ludack concedes that the record before us does not reveal whether he was under arrest and/or had received *Miranda* warnings at the time he made the statement to Detective Lawrence. The State concedes that a defendant's silence before or after his arrest, if attributable to the invocation of the defendant's Fifth Amendment privilege, may not be used by the State as substantive evidence without infringing upon the defendant's due process rights. Appellee's Br. at 15 (citing *People v. Solmonson*, 683 N.W.2d 761, 766 (Mich. Ct. App. 2004)).

6

Ludack did not say during the interview, no error occurred as a result of the prosecutor's follow-up questions. This conclusion is based on two legal principles.

The first is that a prosecutor may comment upon a defendant's decision to invoke the Fifth Amendment right against self-incrimination where the criminal defendant's own arguments invite such a comment. In *United States v. Robinson*, 485 U.S. 25 (1988), defense counsel said in closing argument that the government had not been fair to the defendant (who had not testified) and had unfairly denied the defendant the opportunity to explain his actions. In his rebuttal, the prosecutor stated that the defendant could have taken the stand to explain his side of the story. The defendant argued that the prosecutor's remark violated the Fifth Amendment. In addressing his argument, the *Robinson* court emphasized that "prosecutorial comment must be examined in context." *Id*. at 33. The court concluded that "the prosecutorial comment did not treat the defendant's silence as substantive evidence of guilt, but instead referred to the possibility of testifying as one of several opportunities which the defendant was afforded, contrary to the statement of his counsel, to explain his side of the case." *Id*. at 32. The court held that in light of defense counsel's comments, the prosecutor's statement did not infringe on the defendant's Fifth Amendment right. *Id*. at 31. The court explained the basis for its ruling as follows:

> The central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence. To this end it is important that both the defendant and the prosecutor have the opportunity to meet fairly the evidence and arguments of one another. The broad dicta in *Griffin* [*v. California*, 380

U.S. 609, 615 (1965)[4]] to the effect that the Fifth Amendment "forbids ... comment by the prosecution on the accused's silence," must be taken in the light of the facts of that case. It is one thing to hold, as we did in *Griffin,* that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as defendant does here, that the same reasoning would prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence.

*Id*. at 33-34 (citations, quotation marks, and brackets omitted); *cf. Herron v. State*, 801 N.E.2d 761, 766 (Ind. Ct. App. 2004) (concluding that defense counsel's assertion that State failed to produce evidence of gun used to shoot victim was not invitation for State to comment upon his silence at trial).

The second legal principle supporting our conclusion that no error occurred is that otherwise inadmissible evidence may become admissible where the defendant "opens the door" to questioning on that evidence. *See Kubsch v. State*, 784 N.E.2d 905, 919 (Ind. 2004) (concluding that where defendant opened the door by introducing testimony through defense witness that defendant neither possessed nor had access to handgun, trial court properly admitted otherwise inadmissible hearsay testimony of State's witness implying that defendant had a gun in the house), *cert. denied*. "In order to open the door, the evidence relied upon must leave the trier of fact with a false or misleading impression of the facts related." *Bryant v. State*, 802 N.E.2d 486, 500 (Ind. Ct. App. 2004) (concluding that defense witness's testimony that defendant moved out of mother's residence because he had taken her vehicle

---

[4] In *Griffin*, the prosecutor told the jury in closing argument that the defendant, who was with the victim just prior to her death, was the only person who could provide information regarding certain details about her murder, but he had "not seen fit to take the stand and deny or explain." 380 U.S. at 611. In addition, the trial court instructed the jury that it was permitted to draw an inference unfavorable to the defendant as to "facts within his knowledge [] if he does not testify." *Id.* at 610.

8

opened the door to State introducing evidence that defendant stole checks from mother and chased her with a baseball bat and choked her as real reasons defendant moved out), *trans. denied*; *cf. Ortiz v. State*, 741 N.E.2d 1203, 1208 (Ind. 2001) (concluding that defendant's testimony that he was not a killer did not create false impression that he was an upstanding citizen and therefore did not open the door to evidence of his criminal recklessness conviction).

These two legal principles lead us to conclude that the State may introduce evidence that might otherwise be a violation of the defendant's Fifth Amendment right against self-incrimination if the State's evidence is a fair response to evidence elicited by the defendant. *See Hall v. Vasbinder*, 563 F.3d 222, 234 (6th Cir. 2009) (concluding that testimony elicited by prosecutor about defendant's silence at a probate court hearing at which his daughter was placed in foster care did not violate Fifth Amendment because defense counsel opened the door by first asking defendant's daughter on cross-examination whether her father testified at the hearing). To open the door, the defendant's evidence must use his or her pre-trial silence as probative of the defendant's innocence and leave the trier of fact with a false or misleading impression. *See Bryant*, 802 N.E.2d at 500. This rule protects a defendant's Fifth Amendment privilege and provides "both the defendant and the prosecutor to meet fairly the evidence and arguments of one another." *Robinson*, 485 U.S. at 33. Of course, the State may

9

not introduce such evidence on its own initiative without running afoul of the Fifth Amendment.[5]

Here, on direct examination, the prosecutor asked Detective Lawrence whether Ludack said that he lived with T.E. in June 2008 and took care of her children. That appears to be the entire substance of the interview, and the prosecutor asked no other questions. On cross-examination, defense counsel asked Detective Lawrence whether, during the interview, Ludack had admitted the allegations that he molested M.E. Defense counsel used the question to elicit testimony to imply that since Ludack answered some questions during the interview but did not admit to the allegations, he must be innocent. Thus, Ludack attempted to capitalize on the fact that he chose to remain silent by terminating the interview with Detective Lawrence. In addition, defense counsel's question and the reply created a false impression that Detective Lawrence and Ludack actually talked about whether Ludack committed the alleged acts. We conclude that Ludack opened the door for the prosecutor to question Detective Lawrence as to the scope of the interview. The prosecutor's follow-up questions attempted to clarify that Ludack neither admitted nor denied the allegations. The

---

[5] A defendant's post-arrest, post-*Miranda* silence cannot be used substantively in the State's case-in-chief, *Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986), and cannot be used to impeach a defendant. *Doyle v. Ohio*, 426 U.S. 610, 619 (1976). The U.S. Supreme Court has not addressed whether post-arrest, pre-*Miranda* silence may be used substantively, but Indiana courts have held that a defendant's post-arrest, pre-*Miranda* silence cannot be used as substantive evidence in the State's case-in-chief. *See Peters v. State*, 959 N.E.2d 347, 353 (Ind. Ct. App. 2011); *Akard v. State*, 924 N.E.2d 202, 209 (Ind. Ct. App. 2010), *aff'd in part and rev'd in part on other grounds*, 937 N.E.2d 811 (Ind. 2010); *Rowe v. State*, 717 N.E.2d 1262, 1267 (Ind. Ct. App. 1999). However, Indiana courts have not had to decide whether a defendant's pre-arrest, pre-*Miranda* silence may be used as substantive evidence by the State, although this question and the split among the federal circuit courts was discussed at length in *Owens*, 937 N.E.2d 880, 884-893; *see also Clancy v. State*, 829 N.E.2d 203, 212 (Ind. Ct. App. 2005) (concluding that even if testimony regarding defendants failure to contact police officer was Fifth Amendment violation, trial court's admonishment to jury cured any error), *trans. denied*.

prosecutor's question was a fair response to defense counsel's tactic. It is unsurprising that Detective Lawrence explained why Ludack neither admitted nor denied the allegation, although there is no indication that the prosecutor was actually attempting to elicit testimony that Ludack "asked to stop speaking." Tr. at 125. We also observe that the prosecutor did not comment upon Ludack's request to stop speaking after that. In light of defense counsel's question, we find no violation of Ludack's Fifth Amendment right against self-incrimination.[6] Therefore, no error occurred, let alone fundamental error.

## II. *Appropriateness of Sentence*

At sentencing, the State moved to dismiss the class C felony child molesting counts, which the trial court granted. The trial court found several aggravating factors: Ludack had an extensive criminal history, including convictions for class C felony battery, class A felony rape, and class D felony failure to register as a sex offender; Ludack was on parole for his rape conviction when he committed the current offenses; the victim was under the age of twelve; Ludack was in a position of trust with the victim; and Ludack threatened to harm the victim and her family if she told anyone. The trial court found no mitigating factors. The trial court sentenced Ludack to an aggregate term of one hundred thirty years, executed.

---

[6] Ludack also asserts that the prosecutor made a comment that highlighted Ludack's silence and, when combined with Detective Lawrence's testimony, resulted in fundamental error. During closing argument, the prosecutor argued, "[T]o the extent that John Ludack provided information, he corroborated M.E.'s story; yes, I lived there – yes, I was the sole caregiver for the children when their mother was gone. To that extent, it is corroborated." Tr. at 140. Ludack did not object. Because we have found that Detective Lawrence's testimony did not result in any error and Ludack does not argue that the prosecutor's comment by itself resulted in fundamental error, we need not address the propriety of the prosecutor's comment and whether any error resulted.

Ludack claims that his sentence is inappropriate. Article 7, Section 6 of the Indiana Constitution authorizes "'independent appellate review and revision of a sentence imposed by the trial court.'" *Light v. State*, 926 N.E.2d 1122, 1124 (Ind. Ct. App. 2010) (quoting *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007)) (brackets omitted), *trans. denied*. Our appellate authority is implemented through Indiana Appellate Rule 7(B), which states, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." "The principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). The defendant bears the burden of persuading us that the sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

Regarding the nature of the offense, "the advisory sentence is the starting point the Legislature selected as appropriate for the crime committed." *Pierce v. State*, 949 N.E.2d 349, 352 (Ind. 2011). The sentencing range for a class A felony is twenty to fifty years, with an advisory sentence of thirty years. Ind. Code § 35-50-2-4. Ludack received maximum, consecutive sentences for his class A felony child molesting convictions. In addition, based on Ludack's habitual offender finding, the trial court enhanced his sentence by the maximum of thirty years. *See* Ind. Code § 35-50-2-8 (providing that habitual offender enhancement may not exceed thirty years).

12

Regarding the imposition of the maximum possible sentence, our supreme court has stated,

> [T]he maximum possible sentences are generally most appropriate for the worst offenders. This is not, however, an invitation to determine whether a worse offender could be imagined. Despite the nature of any particular offense and offender, it will always be possible to identify or hypothesize a significantly more despicable scenario. Although maximum sentences are ordinarily appropriate for the worst offenders, we refer generally to the class of offenses and offenders that warrant the maximum punishment. But such class encompasses a considerable variety of offenses and offenders.

*Buchanan v. State*, 767 N.E.2d 967, 973 (Ind. 2002) (citations and quotation marks omitted).

Turning now to the specifics of Ludack's offenses, we observe that M.E. was only eight years old when Ludack moved in with her family and became her mother's boyfriend. Not only did Ludack have a good relationship with M.E. and her brothers, but he was also the children's sole caretaker when their mother was at her full-time job or attending cosmetology school. At the time Ludack began sexually molesting M.E., this arrangement had endured for a year and a half. Clearly, Ludack was in a position of trust with M.E when he sexually molested her. *See Brown v. State*, 760 N.E.2d 243, 246 (Ind. Ct. App. 2002) (noting that defendant, as mother's live-in boyfriend, occupied a position of trust with victim), *trans. denied*. As a result of this close relationship, the acts of sexual molestation pose a greater threat of severe, long-lasting emotional harm to M.E. *See McCoy v. State*, 856 N.E.2d 1259, 1262 (Ind. Ct. App. 2006) (stating that a position of trust "by itself constitutes a valid aggravating factor, which supports the maximum enhancement of a sentence for child molesting"). Further, when Ludack forced M.E. to have sexual intercourse, she was only ten

13

years old. *See Hamilton v. State*, 955 N.E.2d 723, 727 (Ind. 2011) (stating that "[t]he younger the victim, the more culpable the defendant's conduct").

In addition to the sexual violations Ludack inflicted upon M.E., Ludack's abuse was accompanied by violent force as he held M.E. down while she struggled to escape. Ludack also threatened to harm M.E.'s mother or take her mother away for a long time if M.E. told anyone what he had done to her. We agree with the trial court's comment that such threats "were reprehensible attempts to control her and maintain not only his control over her but his freedom to continue to do what he wanted to do." Tr. at 198. Throughout early June 2008, Ludack repeatedly molested M.E. She escaped his ongoing abuse only because he was arrested on June 16.[7] There is no indication that the molestation otherwise would have stopped. We conclude that the nature of Ludack's offenses supports a lengthy sentence.

We next consider Ludack's character. Our supreme court has stated that "the significance of a defendant's prior criminal history in determining whether to impose a sentence enhancement will vary 'based on the gravity, nature and number of prior offenses as they relate to the current offense.'" *Smith v. State*, 889 N.E.2d 261, 263 (Ind. 2008) (quoting *Ruiz v. State*, 818 N.E.2d 927, 929 (Ind. 2004)). Ludack has a lengthy criminal history, beginning in 1983 and continuing with increasing violence and severity. His juvenile history includes true findings for criminal mischief, disorderly conduct, battery, prostitution, and public intoxication. As an adult, he was convicted of class C felony battery in 1990 and was

---

[7] The record before us does not reveal what Ludack was arrested for on that date. His motion in limine states that he was arrested by federal marshals. Appellant's App. at 46.

14

sentenced to eight years executed. After his release from incarceration, he was convicted of class A felony rape in 1997 and sentenced to twenty-five years executed. He was released to parole in July 2006. Within two years and while still on parole for the class A felony rape conviction, he sexually abused M.E., a ten-year-old girl who was in his care. Further, at the time he sexually molested M.E., he was also committing the crime of failing to register as a sex offender, for which he was arrested in July 2008 and found guilty of the following month. Presentence Investigation Report at 5.

Throughout his life, Ludack has shown no willingness to obey the law. Most troubling is that his crimes have become progressively more heinous. Given this criminal history, the depravity of Ludack's character and the danger he represents to society cannot be disputed.

Standing alone, either the nature of Ludack's offenses or his character would support maximum sentences. Taken together, they warrant not only enhanced sentences but consecutive sentences, even though the charges involve the same victim. See *Brown*, 760 N.E.2d at 246 (upholding maximum executed sentence of one hundred thirty years' imprisonment for two counts of class A felony child molestation of same victim and adjudication as a habitual offender).

We acknowledge that "[w]hether the counts involve one or multiple victims is highly relevant to the decision to impose consecutive sentences." *Cardwell*, 895 N.E.2d at 1225. However, the *Cardwell* court also noted that "additional criminal activity directed to the same victim should not be free of consequences." 895 N.E.2d at 1225. The cases in which our

15

supreme court revised consecutive sentences to concurrent sentences where the child molesting charges involved the same victim are easily distinguishable. *See Pierce v. State*, 949 N.E.2d 349, 352-53 (Ind. 2011) (revising one-hundred-thirty-four-year aggregate sentence to eighty-year aggregate sentence where defendant's criminal history included only one prior class C felony molestation conviction that occurred eight years before instant offense); *Rivers v. State*, 915 N.E.2d 141, 144 (Ind. 2009) (revising consecutive sentences to concurrent sentences where defendant molested victim on two occasions in a relatively short period of time, then stopped on his own accord, and did not commit any other offenses in the seven years that passed until he was charged); *Harris v. State*, 897 N.E.2d 927, 930 (Ind. 2008) (revising consecutive fifty-year sentences to concurrent sentences where defendant's criminal history consisted of two class D felonies involving theft and numerous traffic violations, which court concluded were not significant aggravators in relation to class A felony child molestation); *Smith v. State*, 889 N.E.2d 261, 263-64 (Ind. 2008) (revising four consecutive sentences to three concurrent sentences and one consecutive where defendant's criminal history was assigned low aggravating weight due to lack of proximity in time between prior offenses and instant offenses and his mental health (history of depression and two suicide attempts) was a mitigating factor); *Monroe v. State*, 886 N.E.2d 578, 580-81 (Ind. 2008) (revising consecutive twenty-two-year sentences on five counts of class A felony child molesting to fifty-year concurrent sentences where defendant's criminal history of six misdemeanor convictions was assigned little aggravating weight); *Ortiz v. State*, 766 N.E.2d 370, 377 (Ind. 2002) (revising consecutive thirty-year sentences to concurrent terms where

16

trial court failed to adequately identify, explain, and evaluate aggravating circumstances used to impose consecutive sentences); *Walker v. State*, 747 N.E.2d 536, 538 (Ind. 2001) (revising two consecutive forty-year sentences to run concurrently where defendant did not have history of criminal behavior).

In sum, Ludack has failed to persuade us that his one-hundred-thirty-year sentence is inappropriate in light of the nature of the offenses and his character. Therefore, we affirm.

Affirmed.

VAIDIK, J., and BRADFORD, J., concur.