FILED

Aug 11 2015, 9:58 am

CLERK
of the supreme court,
court of appeals and
tax court



| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Timothy P. Broden<br>Lafayette, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana |
| | Chandra K. Hein<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Bryan Gavin,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | August 11, 2015<br><br>Court of Appeals Case No.<br>79A02-1501-CR-27<br><br>Appeal from the Tippecanoe Superior Court<br><br>The Honorable Thomas H. Busch, Judge<br><br>Case No. 79D02-1311-FB-36 |

**Vaidik, Chief Judge.**

# Case Summary

[1] *Miranda* warnings are subject to a public-safety exception. That is, *Miranda* warnings are not required when police officers ask questions reasonably

prompted by a concern for the public safety. Bryan Gavin appeals his multiple convictions stemming from an apartment-complex shooting. Specifically, he argues that the trial court erred by admitting his statement to police about the location of the gun because he made the statement before being informed of his *Miranda* rights. Because the police officer's question to Gavin about the location of the gun was reasonably prompted by a concern for Gavin's three-year-old stepdaughter's safety, we find that the trial court did not err in admitting Gavin's statement. We therefore affirm Gavin's convictions.

## Facts and Procedural History

The facts most favorable to the verdict reveal that around 7:00 a.m. on October 28, 2013, Michael Winston received a phone call from his girlfriend, Erica Veal, to pick her up at 2536 Richmond Court in Cambridge Estates, an apartment complex in Lafayette, Indiana. Michael arrived around 8:00 a.m. and parked his car. He left the car running and knocked on the door. When a man, later identified as Gavin, came to the door, Michael asked for Erica. Gavin said she was not there. When Michael insisted that it was the address that Erica had given him and therefore she had to be there, Gavin responded, "she is not here and if you don't get away from my door[,] I'm going to give you something to get away from my doorway." Tr. p. 98. Believing Gavin was going to hurt him, Michael returned to his car. When Michael got to his car, he grabbed a tire iron from the back seat because he "didn't know what [Gavin] was going to come out and do to [him]." *Id.* at 99.

[3] As Michael was getting ready to call Erica, Gavin pointed his hand out the front door of the apartment and started shooting his .40 caliber semi-automatic handgun. Michael ran. As he ran, two bullets struck him—one in the right hip and the other in the left shin. At some point during the shooting, the window of Gavin's car was shattered. Neighbors heard the gunshots and called 911.

[4] Meanwhile, Gavin ran back inside the apartment to get his three-year-old stepdaughter, J.M. Gavin then put J.M. in his maroon 1976 Cutlass and left just as the police were arriving. Police found Michael lying in a grassy area, and he was taken to the hospital. Police also found bullets and bullet holes in various locations, including in cars and the apartment building across the street.

[5] Dispatch broadcasted that there was an active shooting and gave a description of Gavin's car. Several officers spotted a car that matched the description and pulled over Gavin at the Super Test gas station at the intersection of State Road 38 East and U.S. 52 in Lafayette. With their guns drawn, the officers approached Gavin's car and ordered him out. Gavin "jumped" out the driver's side and said there was a baby in the car. *Id.* at 151. Officer Adam Burton of the Lafayette Police Department ordered Gavin to the ground, where he was handcuffed. Officer Burton then conducted a pat down and found a box of ammunition in Gavin's front sweatshirt pocket.

[6] Because Officer Burton had located the box of ammunition and believed that a child was still inside the car, he asked Gavin "where the gun was." *Id.* at 154. Gavin answered that the gun "was in the car." *Id.* at 155. Another officer then

retrieved J.M. from Gavin's car. The officer noted that the passenger-side window was shattered and that J.M. was not in a booster seat, was not wearing a seatbelt, and was sitting on shattered glass in the back seat. The officer also noted that although it was cold that morning, J.M. was wearing only a shirt and short skirt. Because J.M. was "very cold," *id.* at 74, the officer transferred her to his patrol car until Department of Child Services arrived. Officer Burton took Gavin to the Lafayette Police Department. A later search of Gavin's car revealed a .40 caliber semi-automatic handgun underneath the passenger seat. The seven cartridge cases found throughout the apartment complex were later determined to have been fired from the gun found in Gavin's car.

[7] The State eventually charged Gavin with Count I: Class C felony battery, Count II: Class C felony criminal recklessness, Count III: Class A misdemeanor carrying a handgun without a license; Count IV: Class D felony neglect of a dependent, Count V: Class B felony unlawful possession of a firearm by a serious violent felon, and Count VI: Class C felony carrying a handgun without a license by a convicted felon.

[8] At trial, the State asked Officer Burton if Gavin had made any statements, and Officer Burton said he had asked Gavin where the gun was. At this point, defense counsel asked the trial court if he could ask Officer Burton "a couple foundational questions" about why he had asked Gavin where the gun was before Officer Burton was allowed to give Gavin's answer. *Id.* at 155. Officer Burton then explained that he had asked Gavin about the gun "because of finding the ammo. I wanted to make sure that if the child still is in the vehicle

that . . . they weren't able to get to the gun to possibly harm themselves." *Id.* at 156; *see also id.* at 157 (Officer Burton reiterating that he had asked Gavin about the gun because of the "safety of the child inside the vehicle."). Satisfied with this answer, defense counsel said, "I'm not going to object to that . . . question." *Id.* at 157. Officer Burton then testified that Gavin said the gun was in his car. *Id.*

[9] The jury found Gavin guilty as charged. Because of double-jeopardy concerns, the trial court did not enter judgments of conviction for Counts III and VI. Appellant's App. p. 19. The court then sentenced Gavin to eight years for Count I, eight years for Count II, three years for Count IV, and ten years for Count V. The court ordered the sentences for Counts I, II, and V to be served concurrently but the sentence for Count IV to be served consecutively, for an aggregate sentence of thirteen years.

[10] Gavin now appeals.

# Discussion and Decision

[11] Gavin contends that the trial court erred by admitting his statement to police about the location of the gun because he made the statement before being informed of his *Miranda* rights. The State responds that Gavin has waived this issue for review because defense counsel stated at trial that he had no objection and thus, Gavin must prove fundamental error, which he does not argue on appeal and, in any event, cannot prove.

[12] When the State asked Officer Burton if Gavin had made any statements, Officer Burton said he had asked Gavin where the gun was. Tr. p. 154. Defense counsel did not object but rather asked the trial court if he could ask "a couple foundational questions" before Officer Burton was allowed to give Gavin's answer. *Id.* at 155. After asking Officer Burton questions about why he had asked Gavin where the gun was, defense counsel stated, "I'm not going to object . . . ." *Id.* at 157. Accordingly, because defense counsel said he had no objection, Gavin has waived this issue for review. *See Hayworth v. State*, 904 N.E.2d 684, 693-94 (Ind. Ct. App. 2009). Gavin must therefore establish fundamental error in order to obtain relief.

[13] Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to "make a fair trial impossible." *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014) (quotation omitted), *reh'g denied*. In other words, to establish fundamental error, the defendant must show that, under the circumstances, the trial judge erred in not sua sponte raising the issue because the alleged errors (a) "constitute clearly blatant violations of basic and elementary principles of due process" and (b) "present an undeniable and substantial potential for harm." *Id.* (quotation omitted). The element of such harm is not established by the fact of ultimate conviction; rather, it "depends upon whether [the defendant's] right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he otherwise would have been entitled." *Id.* (quotation omitted). In evaluating the

issue of fundamental error, our task is to look at the alleged misconduct in the context of all that happened and all relevant information given to the jury— including evidence admitted at trial, closing argument, and jury instructions— to determine whether the misconduct had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible. *Id.* Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred; it is not meant "to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error." *Id.*

[14]   The State argues that even though Gavin made the statement about the location of the gun before being informed of his *Miranda* rights, the trial court properly admitted his statement under the public-safety exception to *Miranda*. The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." In *Miranda*, the United States Supreme Court extended the Fifth Amendment privilege against compulsory self-incrimination to individuals subjected to custodial interrogation by the police. *New York v. Quarles*, 467 U.S. 649, 654 (1984). The Fifth Amendment itself does not prohibit all incriminating admissions; "[a]bsent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." *Id.* (quotation omitted). The *Miranda* Court, however, presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights

and freely decides to waive those rights. *Id.* "The prophylactic *Miranda* warnings therefore are not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Id.* (quotation omitted). Requiring *Miranda* warnings before custodial interrogation provides "practical reinforcement" for the Fifth Amendment right. *Id.*

[15] But *Miranda* warnings are subject to a public-safety exception. *Id.* at 655. That is, *Miranda* warnings are not required when police officers ask questions reasonably prompted by a concern for the public safety. *Id.* at 656. "[T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657. Thus, in *Quarles*—where the police were responding to report that a woman had been raped by an armed man who had just entered a supermarket and were "confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in [a] supermarket"—the United States Supreme Court

> decline[d] to place officers . . . in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

*Id.* at 657-58; *see also Price v. State*, 591 N.E.2d 1027, 1030 (Ind. 1992) (recognizing that the public-safety exception to *Miranda* exists when police officers "have an immediate concern for the safety of the general public [when] an armed weapon remain[s] undiscovered").

[16] We find that the public-safety exception to *Miranda* applies here, too. The evidence shows that the officers were conducting a "high[-]risk stop" because they were responding to a call of shots fired. Tr. p. 151, 156. After Officer Burton handcuffed Gavin and located the box of ammunition in his front sweatshirt pocket, he asked Gavin where the gun was because he "believed the child was *still* in the vehicle" and "wanted to make sure that if the child still is in the vehicle that . . . they weren't able to get to the gun to possibly harm themselves." *Id.* at 154, 156 (emphasis added). Gavin answered that the gun was in his car. Because Officer Burton's question to Gavin about the location of the gun was reasonably prompted by a concern for the safety of Gavin's three-year-old stepdaughter, *see Bailey v. State*, 763 N.E.2d 998, 1002 (Ind. 2002) ("Though Officer Allender's concern was not for the general public's safety, as it was in *Price* and *Quarles*, it was for the safety of another possible victim. There is a fair amount of authority holding that questioning for the limited purposes of locating or aiding a possible victim falls within the 'public safety exception' to *Miranda*."), we find that the trial court did not commit error, much less fundamental error, in admitting Gavin's statement about the location of the gun.

[17] Affirmed.

Robb, J., and Pyle, J., concur.