## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 24 2018, 5:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Zachary J. Stock
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Kelly A. Loy
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Delmar Kelly,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | September 24, 2018<br><br>Court of Appeals Case No.<br>18A-CR-1162<br><br>Appeal from the Hendricks<br>Superior Court<br><br>The Honorable Rhett M. Stuard,<br>Judge<br><br>Trial Court Cause No.<br>32D02-1710-F2-25 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Delmar Kelly appeals his conviction for dealing in narcotics. He contends that the trial court committed fundamental error in allowing the State to present evidence of his post-arrest, pre-*Miranda* silence during trial and to reference this evidence during its closing argument because it violated his due-process rights. We find no error, but even if there was error, it was not fundamental. We therefore affirm the trial court.

# Facts and Procedural History

On October 3, 2017, cousins Roosevelt Garrett and Cameron Johnson went to a family member's house in Indianapolis to "hang[] out," smoke marijuana, and drink. Tr. Vol. II p. 222. Kelly, a family friend, also went to the house, arriving separately in a rental car. *Id.* at 224. The three men ended up spending the night at the house.

[2] The next day, October 4, the three men left the house around noon, with Kelly driving them in his rental car. While in the car, Roosevelt saw that Kelly had a digital scale and a plastic grocery bag. The grocery bag had something inside that he could not see. Tr. Vol. III p. 6.

[3] That same day, the Hendricks County United Drug Task Force was conducting a "takedown" at the house of a suspected drug dealer on Jonathan Court in Avon. Tr. Vol. II p. 97. After the suspect had been arrested and transported to jail and while the officers were searching the house, Detective John Maples

found a cell phone that he believed belonged to the suspect. The phone, which was not locked and did not have a code, displayed a recent text message.

[4] From the text messages, Detective Maples learned that the suspect had attempted to purchase an ounce of methamphetamine the night before, but the transaction did not occur. Detective Maples, posing as the suspect, responded to the text message. The person apologized and said he would lower the price for the trouble. Detective Maples asked the person when he would be at the Jonathan Court address, and the person responded that he was coming "now" and would be in a Hyundai. Ex. 1. At 4:30 p.m., the person texted, "Im pulling" and "Come." *Id.* Within a minute, Detective Maples saw a Hyundai pull up outside the house on Jonathan Court. Other task-force officers, including Detective Brian Petree, were positioned nearby in unmarked cars. As the Hyundai pulled up, one of the officers activated his lights and sirens and tried to stop the Hyundai. But the driver of the Hyundai—later identified as Kelly—"began driving between houses and through backyards." Tr. Vol. II p. 123.

[5] A five-mile car chase ensued, with Detective Petree eventually catching up to Kelly. During the pursuit, Kelly passed Avon High School, weaved in and out of traffic, and reached speeds up to 70 miles per hour on Dan Jones Road. While on Dan Jones Road, Detective Petree saw items being thrown from the passenger side of the Hyundai, and he reported the location of the thrown items as he was driving. As Kelly turned into The Settlement, a large residential neighborhood in Plainfield, a black item was thrown from the Hyundai and hit

Detective Petree's windshield. Detective Petree couldn't tell what side of the car this item was thrown from. Once inside The Settlement, Kelly reached speeds up to sixty miles per hour and ran stop signs. At some point, however, the officers were able to box in the Hyundai. Detective Petree exited his car, approached the Hyundai with his gun "[t]rained at the occupants," and ordered the three men to show their hands. *Id.* at 156. Eventually, all three men put their hands up. The officers then ordered the men out of the Hyundai one at a time. The men were handcuffed and separated from each other.

[6] During a search of the Hyundai, five cell phones (some of which were "burner" phones) and a box of ammunition were found. *Id.* at 138. The officers also searched the pursuit route and found a bag of heroin, a bag of cocaine, and a black digital scale (which Detective Petree identified as the object that had hit his windshield).[1] One of the bags was found in front of Avon High School. *Id.* at 143.

---

[1] The officers looked for the phone that was used to text the suspect, a gun, and more drugs, but they were not found. Tr. Vol. II p. 166. According to Detective Petree, it was possible that more items were thrown from the Hyundai than he was able to see, because he did not catch up to the car until Avon High School. *Id.* at 130, 142. Moreover, Detective Petree said it was almost impossible to find everything on the five-mile pursuit route. *See id.* at 159 ("[O]n a five mile stretch of road, there is almost no chance you're going to find everything . . . [e]ven with a K-9.").

[7] Thereafter, the State charged Kelly with Level 2 felony dealing in a narcotic drug (heroin and cocaine) and Level 6 felony resisting law enforcement.[2] A jury trial was held.

[8] During opening statement, defense counsel argued that Kelly drove "cousins, Cameron and Roosevelt, out to [the house in Avon] for some money and [did] not really know what was going on and g[o]t caught up in [a] narcotics bust." Tr. Vol. II p. 91; *see also id.* ("Kelly was [nothing] more than an unknowing means to an end for cousins, Cameron and Roosevelt."). In support, defense counsel played an audiotape of a phone call that Kelly placed from jail to the mother of his children the day after his arrest. *Id.* at 85. During the phone call Kelly said:

> [Y]ou know what I was doing, right? Driving around trying to make some money and stuff, right? . . . That's why I got that rental and stuff so, basically, I drove somebody out here for some money or whatever and, uh, sh\*\*, it was a narcotics bust or whatever and I got caught up in it. So now I got to fight a Level 2 felony . . . . [B]asically, end of the day, I ain't had nothing on me you feel me?

Ex. 10; Tr. Vol. II p. 86.

---

[2] The State also charged Roosevelt and Cameron with Level 2 felony dealing in narcotics. Both men pled guilty to Level 4 felony dealing and were sentenced to two years of probation. Tr. Vol. II pp. 243-45; Tr. Vol. III p. 4. As a condition of their probation, Roosevelt and Cameron agreed to testify truthfully in this case (Roosevelt is the only one who testified though). According to Roosevelt, during his guilty-plea hearing he admitted that he, Cameron, and Kelly were in the Hyundai to go deliver drugs. Tr. Vol. II p. 243.

[9]     During the direct examination of Detective Maples, the prosecutor asked him what happened after the pursuit ended in The Settlement. Detective Maples said he "assisted [other officers] with speaking with all three of" the men. Tr. Vol. II p. 107. The following exchange then occurred:

> Q    Uh, any admissions by the three about what . . . was going on or what they were doing?

> A    No, there was not.

> Q    Did any of them give you any information about what they were doing?

> A    They did not, no.

> Q    Did anybody act surprised at all that they were in a pursuit and stopped by police?

> A    Yes, . . . I had one I think t[ell] me he slept through the whole thing—wasn't even sure what was going on. He just woke up.

> Q    (Interposing) Was that the driver of the car?

> A    No.

*Id.* at 107-08. During the direct examination of Detective Petree, the prosecutor asked him what happened to Kelly after the pursuit ended. Detective Petree responded that "Detective Maples . . . interviewed Mr. . . . Kelly." *Id.* at 136. The following exchange then occurred:

Q      (Interposing) Okay. At any point . . . during your
         observation of . . . Mr. Kelly, did . . . he at all seem
         befuddled or confused about why he was . . . being
         stopped?

* * * * *

A      No sir.

Q      Did he say anything to you?

A      Uh, none of the three really wanted to talk to us.

*Id.* at 137. Defense counsel did not object to either exchange on grounds that it violated Kelly's right to remain silent.[3]

[10]    During closing argument, the prosecutor argued, in part:

[Kelly's] actions prove his intent. His guilty mind; what he was doing in that rental car that he obtained. His guilty mind is also proven by things he didn't say. After the pursuit when he was given a chance to talk, to say what happened, to say, I don't know, [Roosevelt] just asked me to drive him to see a friend for money, we didn't hear that. He didn't say that. He didn't say I was just driving out here to meet a friend. I've [g]ot no idea why you're . . . stopping me. He wasn't surprised at all he was being stopped because he knew exactly what was happening. You heard from that jail . . . phone call, he [got] caught up in a narcotics bust. He didn't know police would be waiting for him when he arrived at that Jonathan Court address. So there's no

---

[3] Defense counsel did object during the second exchange, but it was on different grounds (leading question).

reason for him to be surprised cause he knew exactly what he was doing.  Wasn't surprised cause he knew exactly what he was doing.  Wasn't surprised and at no time during that five mile pursuit did he stop voluntarily.  At no time did he stop and say, please I . . . was scared; I ran after driving through those yards, I just had to stop.  I realize my mistake.  No, he drove through those yards; drove through on 150, Dan Jones, weaving in and out of traffic; approaching speeds of nearly seventy miles per hour on Dan Jones.  Speeds of nearly sixty miles per hour in [T]he Settlement neighborhood.  Only stopped when that neighborhood got so winding, so difficult to navigate that he had nowhere else to go.  His affirmative conduct proves his intent to deal that day.  The things he didn't say, no expression of confusion prove his intent that day.

Tr.  Vol. III pp. 42-43.  Again, defense counsel did not object.  Defense counsel then conceded that the State had proven the charge of resisting law enforcement but argued that the State had not proven that Kelly knowingly possessed the drugs.  *Id.* at 45-50.  The jury found Kelly guilty of the dealing and resisting charges, and the trial court sentenced him to an aggregate sentence of sixteen years, with eight years suspended to probation.

[11]    Kelly now appeals his dealing conviction only.

# Discussion and Decision

[12]    Kelly contends that the trial court should not have allowed the State to present evidence of his post-arrest, pre-*Miranda* silence during trial or to reference this

evidence during its closing argument because it violates his due-process rights.[4] Kelly acknowledges that because he did not object, he must establish fundamental error. The doctrine of fundamental error is an extremely narrow exception to the waiver rule that requires the defendant to show that the alleged error was so prejudicial to the defendant's rights as to make a fair trial impossible. *Gavin v. State*, 41 N.E.3d 1038, 1042 (Ind. Ct. App. 2015). The defendant must show that, under the circumstances, the trial judge erred in not raising the issue sua sponte because the alleged error (a) constituted a clearly blatant violation of basic and elementary principles of due process and (b) presented an undeniable and substantial potential for harm. *Id.*

[13] The Fifth Amendment to the U.S. Constitution, made applicable to the states through the Fourteenth Amendment, provides that no person shall be compelled in any criminal case to be a witness against himself. U.S. Const. amend. V; *Cameron v. State,* 22 N.E.3d 588, 592 (Ind. Ct. App. 2014). To protect that right, police officers, before questioning citizens in custody, must advise them that they have the right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). In *Doyle v. Ohio,* 426 U.S. 610 (1976), the United States

---

[4] As the State points out in its brief, "[t]here is no evidence that Kelly was Mirandized upon apprehension or before the police tried to talk to [him] at the scene." Appellee's Br. p. 15. Notably, Kelly does not challenge this assertion in his reply brief. In the absence of such evidence, we cannot speculate that *Miranda* rights were given to Kelly right after the three men were apprehended and before the officers started talking to them. *See Myers v. State*, 27 N.E.3d 1069, 1080 (Ind. 2015) (explaining that because the party who alleges error has the duty to provide a proper record on appeal so that an intelligent review may be made, it would not speculate that *Miranda* warnings were given in the absence of such evidence in the record), *reh'g denied*.

Supreme Court held that the use of a defendant's silence, which occurs at the time of arrest and after receiving *Miranda* warnings, for impeachment purposes violates the Due Process Clause of the Fourteenth Amendment. *Id.* at 619. The underlying rationale was that use of a defendant's post-arrest, post-*Miranda* silence to impeach an explanation subsequently offered at trial would be contrary to the *Miranda* warnings' implicit assurance to an individual in police custody that silence will carry no penalty. *Id.* at 618; *see also Brecht v. Abrahamson*, 507 U.S. 619, 628 (1993). The United States Supreme Court has also held that a defendant's post-arrest, post-*Miranda* silence cannot be used substantively in the prosecution's case-in-chief. *See Wainwright v. Greenfield,* 474 U.S. 284, 295 (1986).

[14] The United States Supreme Court, however, has not addressed the precise issue in this case, that is, whether post-arrest, pre-*Miranda* silence may be used substantively in the prosecution's case-in-chief.[5] *See United States v. Wilchcombe*, 838 F.3d 1179, 1190-91 (11th Cir. 2016) (discussing circuit split), *cert. denied*; *Cameron*, 22 N.E.3d at 592 ("Whether a defendant's post-arrest, pre-*Miranda* silence may be used substantively has yet to be addressed by the United States Supreme Court[.]"). Nevertheless, Kelly argues that this Court "has held on

---

[5] The United States Supreme Court has held that evidence of a defendant's post-arrest, pre-*Miranda* silence for impeachment purposes does not violate a defendant's due-process rights. *See Fletcher v. Weir*, 455 U.S. 603, 607 (1982) ("The significant difference between the present case and *Doyle* is that the record does not indicate that respondent Weir received any *Miranda* warnings during the period in which he remained silent immediately after his arrest. The majority of the Court of Appeals . . . sought to extend *Doyle* to cover Weir's situation . . . . We think that this broadening of *Doyle* is unsupported by the reasoning of that case and contrary to our post-*Doyle* decisions.").

several occasions that 'a defendant's post-arrest, pre-*Miranda* silence cannot be used as substantive evidence in the State's case-in-chief.'" Appellant's Br. p. 8 (quoting *Ludack v. State*, 967 N.E.2d 41, 46 n.5 (Ind. Ct. App. 2012), *trans denied*).

[15] The Indiana Supreme Court recently addressed the use of a defendant's post-arrest, pre-*Miranda* silence as substantive evidence in *Myers*. In that case, the defendant asserted an insanity defense, and the State used evidence of his post-arrest silence to prove his sanity. Our Supreme Court explained that the protections set out in *Doyle* and *Wainwright* are triggered by the implicit promise that is made to a defendant that he will not be penalized for choosing to exercise his right to remain silent. *Myers*, 27 N.E.3d at 1080. Because there was nothing in the record suggesting that Myers had been advised of his *Miranda* rights, the Court held that the State's use of Myers's silence did not violate his constitutional due-process rights. *Id.* at 1081. The Court cautioned that its analysis was not intended "to suggest that it is permissible for law enforcement to indefinitely withhold giving *Miranda* rights in order to allow the prosecution to use any post-arrest pre-*Miranda* statements at trial." *Id.* at 1081 n.3.

[16] Kelly acknowledges *Myers* in his brief. *See* Appellant's Br. p. 8 (using a "[b]ut see" cite to *Myers*). However, he makes no attempt to distinguish it. Accordingly, in light of the Indiana Supreme Court's decision in *Myers*, we conclude that the use of Kelly's silence under these circumstances did not violate his constitutional due-process rights.

[17]  But even if we found that the trial court erred in allowing the State to present evidence of Kelly's post-arrest, pre-*Miranda* silence during trial or to reference this evidence during its closing argument, the error is not fundamental. The State claims that it asked the detectives the questions and then commented on Kelly's silence during closing argument "in an effort to rebut [Kelly's] defense that he was oblivious that there was a drug transaction being scheduled at the house on Jonathan Court[.]" Appellee's Br. p. 17; *see also id.* at 18. In addition, the references to Kelly's silence during the testimony of Detectives Maples and Petree were few and brief in the context of the entire trial. As for the prosecutor's argument during closing that Kelly's guilty mind was evidenced by the things he did not say, the bulk of the prosecutor's argument focused on Kelly's actions:

> You say you're going to make some money; you get a clean rental car not registered in your name; you show up at a prearranged drug deal in the same car that you say you're going to show up; when the police arrive and you find out that you're busted, you drive away for nearly five miles at speeds approaching seventy miles per hour giving time to throw out evidence of your crime which includes more than ten grams of narcotics. Mr. Kelly is guilty of dealing narcotics. I'd ask you to find him guilty. Thank you.

Tr. Vol. III p. 53. Finally, there is substantial evidence that Kelly knew about the drugs in the car. *See* Appellant's Reply Br. p. 6 ("The State needed to prove that Kelly was aware that he was driving with drugs in the car."). According to Roosevelt, Kelly had a digital scale in the rental car and was the one who was handling the drugs. Tr. Vol. III p. 5. Kelly then drove the rental car to a drug

dealer's house in Avon and led the officers on a high-speed, five-mile chase when they tried to pull him over. During the chase, a digital scale and bags of drugs were thrown from the car. For these reasons, we cannot say that the references to Kelly's silence made a fair trial impossible. We therefore affirm the trial court.

[18] Affirmed.

Riley, J., and Kirsch, J., concur.